NEAL *v.* FOSTER *et al.*

(*Circuit Court, D. Oregon.* August 20, 1888.)

1. **JUDGMENT—RES ADJUDICATA.**
   The determination of a point or question in any legal proceeding binds the parties thereto and their privies in any subsequent litigation that may arise between them, although the cause of action in the two proceedings is not otherwise identical.

2. **EVIDENCE—DECLARATIONS—VENDOR AND VENDEE.**
   The acts and declarations of a vendor in possession after the sale are competent evidence against the vendee on the question of the character and purpose of such sale.

3. **TAXATION—TAXABLE PROPERTY—TAXABLE CREDITS.**
   A person cannot lawfully nor truthfully omit a note from his statement of his taxable credits on the ground that there is an understanding between him and the maker thereof that he will not deduct the amount of the same from the value of his property listed for taxation.

4. **COURTS—FEDERAL COURTS—JURISDICTION—MOTIVE OF SUITOR.**
   The motive with which a person purchases property or a claim has nothing to do with his right to maintain an action thereon or thereabout in the national courts; and so it does not affect the jurisdiction of said courts if the purchase is made with the expressed intention of suing therein.

5. **JUDGMENT—LIEN—FRAUDULENT CONVEYANCE—RIGHTS OF CREDITORS.**
   A conveyance of real property, though void as to creditors asserting their right against it, passes all the estate of the grantor in the premises to the grantee; and therefore the lien of a subsequent judgment against the grantor, which only attaches to property then belonging to him, does not affect the property so conveyed; and the creditor first seeking to set aside such conveyance obtains a prior right to satisfaction thereout, from the commencement of his suit for that purpose.

6. FRAUDULENT CONVEYANCES—WHAT CONSTITUTES—CONSIDERATION.

> The grantee in a conveyance of real property by an insolvent debtor having paid at least three-fourths of its cash value therefor, by the redemption of certain wheat-warehouse receipts of the grantor, concerning which he was then liable to a criminal prosecution, and the discharge of certain obligations on which he was surety, *held*, that the circumstances do not warrant the conclusion that the conveyance was made or taken with intent to hinder, delay, or defraud creditors.[1]

7. SAME.

> A conveyance by an insolvent debtor of a block of brick buildings for the alleged consideration of the surrender of six notes of the grantor for the principal sum of $16,000, payable to the grantee, which notes are in fact without consideration. *Held*, that the conveyance was voluntary, and therefore fraudulent as against the creditors of the grantor.[1]

*(Syllabus by the Court.)*

Suit to Enforce Judgments.

*C. E. S. Wood* and *George H. Williams*, for plaintiff.

*Earl C. Bronaugh* and *L. Flinn*, for defendants Crawfords and Pearce.

*J. K. Weatherford* and *Charles E. Wolverton*, for defendants Goltra, Walden, Liles, and Baltimore.

DEADY, J. This suit is brought by the plaintiff, a citizen of Illinois, against James A. Foster, John A. Crawford, William Crawford, and Ashby Pearce, citizens of Oregon. The plaintiff sues as the assignee and owner of two certain judgments against the defendant Foster, and to set aside, as fraudulent, three certain conveyances executed by Foster to John A. Crawford, William Crawford, and Ashby Pearce, respectively. William H. Goltra, E. Walden, John R. Baltimore, and J. S. Liles, citizens of Oregon, and judgment creditors of Foster, are also made parties defendant.

It is alleged in the bill that on and prior to February 6, 1884, Foster was indebted to Sibson, Church & Co. in the sum of $13,034.96, which claim was on July 15, 1885, assigned to Sibson, Quackenbush & Co., who on March 8, 1886, obtained judgment thereon for $14,066.72, in the circuit court of Linn county, Or., which judgment was then docketed therein, and on March 15th an execution issued thereon and was returned unsatisfied; that on June 11, 1886, Sibson, Quackenbush & Co. sold and assigned said judgment to the plaintiff, who now owns the same.

That on March 8, 1886, Noon & Co. obtained a judgment in said circuit court against Foster, on a promissory note and account for goods, in the sum of $1,920.35, which judgment was then docketed therein, and on March 15th an execution issued thereon and was returned unsatisfied; and that on June 19th Noon & Co. sold and assigned said judgment to the plaintiff, who now owns the same.

That when said debts were contracted, on which said judgments were obtained, Foster was the acknowledged owner of the following real prop-

---

[1]As to what constitutes a fraudulent conveyance, and what is sufficient proof of fraud to cause a conveyance to be set aside, see Stoddard v. Rowe, (Iowa,) 39 N. W. Rep. 84, and note; Satterfield v. Malone, 35 Fed. Rep. 445, and note; Bernard v. Myroleum Co., (Mass.) 17 N. E. Rep. 887, and note.

erty, situate in Albany, in said county and state: (1) The Magnolia flour-mill and lot, including the race connecting the mill with the Santiam water-ditch; (2) block 55, except two lots; (3) lot 1 in block 11; (4) one-half interest in the Albany water-works; (5) a parcel of land 74 feet by 100, with brick buildings thereon; and (6) part of lot 7 in block 4 with a brick store thereon; that on February 6, 1884, Foster conveyed all of said property except the fifth and sixth items to the defendant John A. Crawford, and on the same day conveyed the fifth item to the defendant William Crawford, and on February 7th conveyed the sixth item to the defendant Ashby Pearce; that each of said conveyances was voluntary and without consideration, and was made by the grantor, and accepted by the grantee, therein, with intent to hinder, delay, and defraud the creditors of Foster, and particularly the assignors of the plaintiff, Sibson, Quackenbush & Co., and Noon & Co.; that Foster is insolvent; that the property so conveyed was then worth $110,000, and was all the property Foster had, and he is still in the possession and enjoyment of the same.

That subsequent to said conveyances the other defendants herein obtained judgments in said circuit court against Foster, as follows: Baltimore, March 10, 1884, for $1,652.92; Goltra, February 23, 1886, for $1,636.90; Liles, March 12, 1886, for $1,049.75; and Walden, February 23, 1886, for $568.50.

The prayer of the bill is that the conveyances be set aside as fraudulent, and the property be sold to pay the claims of the plaintiff, and the defendants Baltimore, Goltra, Liles, and Walden, according to their respective priorities.

The defendants Foster and the Crawfords, by their joint answer, admit the judgments against Foster, as stated in the bill, but deny that the plaintiff is the owner of any of them, and allege that the assignments thereof to him by Sibson, Quackenbush & Co. and Noon & Co. were made without consideration, and for the sole purpose of giving this court jurisdiction. They admit the execution of the conveyances to the Crawfords and Pearce, as stated in the bill, but deny that they are voluntary, or were made or accepted with intent to hinder, delay, or defraud creditors, and allege that at the date thereof Foster was short about 20,000 bushels of wheat, for which he had given receipts; and that Foster conveyed the items one, two, three, four, and five of said property, and certain book-accounts and grain-sacks, to the Crawfords, in consideration of John A. Crawford's taking up those receipts, and $64,000 to be paid him by the surrender of certain notes and an account due from Foster to said John A., and certain other notes due from Foster to William Crawford, and the payment by John A. of certain notes of Foster's, on which he was surety; and that the conveyance to Pearce was made subject to Mrs. Foster's right of dower, in consideration of the payment by him of $4,000 as security for Foster.

They admit that on, prior, and since February 6, 1884, Foster was and is insolvent, and aver that the property conveyed is not worth more than $56,000.

The defendants Baltimore, Liles, Walden, and Goltra answer the bill jointly, admitting the allegations thereof, and that they are severally the owners of the certain judgments obtained by them in 1886, in the circuit court of Linn county, Or., against Foster, as alleged in the bill; and also allege that Goltra is the owner of a certain other judgment obtained by him in said circuit court, on February 23, 1886, against said Foster, on twelve promissory notes and one account theretofore assigned to him, for the sum of $16,119.70, which judgments they allege are each a lien on the property of Foster in said county; and that the property conveyed to the Crawfords and Pearce was so conveyed with intent to hinder, delay, and defraud the creditors of Foster, including the defendants.

Afterwards the defendants Foster and the two Crawfords filed a cross-bill, alleging therein that on February 10, 1886, Goltra commenced a suit in the circuit court aforesaid against the plaintiffs in the cross-bill to enforce the judgment for $16,119.70 theretofore obtained against Foster, as stated in his answer herein, against the property in question, on the ground that the conveyances thereof by Foster to the Crawfords and Pearce were invalid, because made with intent to hinder, delay, and defraud the creditors of the grantor, including Goltra and his assignors; that the defendants in said suit answered the complaint therein, denying the allegations of fraud, and alleging that said conveyances were made in good faith, and for an adequate consideration, to which answer there was a reply by Golta; that the cause was heard on the issue thus made, when the court, on July 9, 1886, found in favor of the defendants, and dismissed the suit; that Goltra took an appeal to the supreme court of the state, where, on April 11, 1887, said appeal was dismissed, whereby the judgment of said circuit court remains in full force and effect, and Goltra is thereby estopped to say that said conveyances are invalid, for the reason assigned.

A demurrer to this cross-bill was overruled, and the same taken for confessed. 34 Fed. Rep. 496. And it is now admitted by counsel that Goltra is estopped to say in this suit, in support of said judgment, that these conveyances are invalid, because made in fraud of creditors.

But counsel maintain that the judgment of Goltra, obtained on February 23d, for $1,637.20, is not within the operation of said estoppel, because the judgment was not included in the suit out of which the estoppel arises. It is true that the decree in the former case between the parties to the cross-bill was given in a suit in which the right to enforce this particular judgment against this property was not involved. But the question on which such right depends was so involved. A question contested and determined in one case is determined, so far as the parties to the same are concerned, for all time and all purposes. It cannot be ground over again in another action.

The question of the validity of Foster's conveyances to the Crawfords and Pearce, for the cause alleged, namely, that they were executed with intent to hinder, delay, and defraud creditors, was the principal and only contested question in the suit of Goltra against Foster and the Crawfords;

and the decision therein that they were not so executed estops the parties and their privies to allege or maintain aught to the contrary, in this or any other litigation between them. *Outram* v. *Morewood*, 3 East, 346; *Cromwell* v. *County of Sac*, 94 U. S. 351; *Wilson's Ex'r* v. *Deen*, 121 U. S. 525, 7 Sup. Ct. Rep. 1004; Bigelow, Estop. 84; *U. S.* v. *Schneider*, 35 Fed. Rep. 107.

This disposes of the case made in the cross-bill. Goltra is estopped to allege or contend that the conveyances in question are fraudulent. That identical point was found against him in the former suit, and therefore, as against Foster or his grantees, he cannot make or state a case that will entitle him to subject the property to the satisfaction of either of his judgments against the former.

In the progress of the case it was referred by the circuit judge to a master, to take the testimony, and report the same with his conclusions of fact and law thereon. The report finds (1) that at the commencement of this suit the several judgments mentioned in the pleadings were owned by the plaintiffs therein, except those of Noon & Co. and Sibson, Quackenbush & Co., which had been theretofore duly assigned to the plaintiff, who was the owner thereof; (2) that the conveyances to Pearce and John A. Crawford were made in good faith, and for "full value," while that to William Crawford was made without consideration, and is void as against the plaintiff and other creditors of said Foster; (3) that on February 6, 1884, the date of said conveyances, and since, Foster was insolvent, and has no property out of which any of such judgments can be made; (4) that the real property conveyed to John A. Crawford was at the date of the conveyance thereof worth $36,000, in addition to which he then received from Foster accounts and grain-sacks worth $6,000, in all $42,000, and that Foster then owed said Crawford on notes and accounts $27,733.50, while the latter was liable to pay for the former, as surety, about $16,000, all of which debts and liabilities he released and paid, and also made good to sundry persons a deficiency in wheat in the mill warehouse of near 20,000 bushels, which cost him near $10,000 more, in all $53,733.50; (5) that at the date of the conveyance to Pearce he was an accommodation indorser for Foster on a note for $5,000, that he afterwards paid; that the real property conveyed to him was worth $3,500, in addition to which he received $700 worth of mill products; that the property conveyed to William Crawford was then worth $18,000, upon which he has since expended in permanent improvements the sum of $2,000.

Both parties excepted to the master's report,—the plaintiff, to the finding in relation to the conveyances to John A. Crawford and Pearce; and the defendant William Crawford, to the finding concerning the conveyance to himself.

On the argument, it was tacitly conceded that the conveyance to Pearce was made for a full consideration, as found by the master, and with no other purpose than to prefer him to other creditors, as the grantor lawfully might, and of this there can be no doubt on the testimony.

At and before February 6, 1884, Foster was in a financial strait. By

reason of a decline in flour during the winter, he had lost or failed to realize one dollar a barrel on about 30,000 barrels shipped to Liverpool. He was also short about 20,000 bushels of wheat, for which he had given receipts, on any one of which he was liable at any moment to a criminal prosecution. There is no room to doubt that John A. Crawford was then liable as surety on Foster's paper for $15,900, namely, to the Bank of British Columbia, $5,000; to John Conner and the Bank of Albany, $6,000; and to Frank Parton, $4,900,—and that he afterwards paid the same, as part of the consideration for the transfer to him.

Neither is there any room to doubt that Crawford settled with the farmers and others holding Foster's wheat receipts for 19,541 bushels of wheat that the latter had used. But the amount disbursed for this purpose is not certain. The evidence on the point is not clear or satisfactory. Wheat, at the time of the transfer, was 90 cents per bushel. But it was rapidly declining, and soon fell to near 50 cents. It is altogether probable that from $10,000 to $15,000 was paid out for Foster on this score,—say $12,500. This, added to the amount paid by Crawford, as surety or indorser, makes $28,310 paid on the property in cash. In addition, Crawford claims to have turned in an open account of $5,803 against Foster, as a part of the consideration for the purchase. Under the circumstances, the claim is a probable one. Crawford seems to have been carrying Foster in every direction; and, on the proof, it cannot be rejected. This, with the cash, makes a consideration of $34,113 paid for the property, real and personal,—more than it would have probably sold for at sheriff's sale, and more than three-fourths of the value that the master places upon it, which, in my judgment, is its full market value.

If the purchase was made in good faith, that is, for the purpose of providing for the payment of the debts due the purchaser, or the obligations on which he was surety for the grantor, and not merely to hinder, delay, and defraud creditors, the conveyance is not within the statute of frauds, and is valid. The amount and character of the consideration is not material, except as it may affect the question of good faith. Bump, Fraud. Conv. 207. Neither the amount nor character of this consideration tends to prove that the purchase was not made in good faith.

The only specific circumstance urged against the good faith of this transfer is the fact that Foster remained in possession of the mill and dwelling-house, and his declarations while there. The acts and declarations of a vendor in possession after the sale are competent evidence against the vendee on the question of the character and purpose of such sale and possession. Bump, Fraud. Conv. 589; U. S. v. Griswold, 7 Sawy. 316, 8 Fed. Rep. 496. But such acts and declarations are not conclusive, and must be considered in the light of all the circumstances. Mr. Foster was an old man, who had done business in Albany as merchant and miller for over 30 years. When he failed and transferred his property to his life-long friend and principal creditor, John A. Crawford, it was not unreasonable, nor out of the ordinary course of business, for the latter, who was over 70 years of age, and had been out of the mill-

ing business for many years, and was otherwise much engaged, to retain Foster as superintendent of the mill, both for his own interest, as well as a kindly consideration for Foster, who was then thrown on the world without any visible means of support, at a compensation of $75 per month, and the use of the dwelling-house in which he lived. But Foster's declarations to his other creditors, all of whom are represented in the several judgments mentioned in the pleadings, do indicate that he expected to get the mill back again, either as owner or lessee of Crawford, in which case, if times "livened up," he would be able to pay all his debts from the profits of the mill. But I am satisfied he either went beyond the fact, or his hearers, smarting under the loss of their claims, have remembered and repeated his statements for more than they were worth. As is said by counsel in the brief for plaintiff, "each of these witnesses was not only a friend of many years' standing with Foster, but also a creditor. Some of them had sold him wheat only a few days before the transfer; and in the presence of men whom he had so wronged, * * * and who, nevertheless, still displayed some old-time loyalty and friendship towards him, it is quite natural he should seek to placate them, and restore himself in their esteem by an explanation that would not leave them hopeless."

Under these circumstances Foster might have made statements and held out hopes that implied, in the willing minds of his anxious hearers, that, after all, the transfer was only a contrivance to tide over a financial difficulty, and in the mean time Crawford was only holding the property in trust for him.

One form of declaration attributed to him is, "that if he could make arrangements with his creditors he could lease the mill, and pay them off, if times 'livened up,' out of the profit of it." And this declaration is perfectly compatible with a *bona fide* sale. Neither would it be difficult or extraordinary for those who would have it so, to remember and relate how Foster said "he was going to get the mill back again as soon as he could arrange with his creditors," with the implication, of course, that such was the purpose of conveying it to Crawford.

However this may be, there is nothing in Foster's possession or presence at the mill or employment by Crawford inconsistent with good faith on the part of the purchaser. And so far as any of his declarations import the contrary, assuming that he has been correctly reported, they are easily accounted for, and are also contradicted by the admitted and controlling circumstances of the case.

The evidence as to whether Crawford also turned in Foster's three notes in part payment of this property is conflicting, but I think the weight of it is that he did.

Crawford and Foster both swear that in 1876 the mill firm of James H. Foster & Co.—the company being the brother, John Foster—dissolved, and James H. took the business, and agreed to pay the debts. At that time Crawford held three notes of J. H. Foster & Co., dated early in July, 1875, for an aggregate sum of $12,593, with interest. The notes are produced, and their existence is satisfactorily established. On April

28, 1876, on a settlement with Crawford, Foster gave his two individual notes for the three company notes and interest, payable one day after date, with interest at 10 per centum per annum,—the one for $8,605, and the other for $5,325, or $13,930 in the aggregate; and on September 12, 1878, Foster gave Crawford another note for $3,000, payable one year after date, with like interest, for money then loaned him. On the first of these notes there is indorsed a payment of $1,721 of interest, dated April 27, 1878, and on the second a like payment at the same date of $1,065. On the third note there is an indorsement of $350, dated June 19, 1882, which was afterwards canceled. No other payments appear to have been made on either of these notes prior to February 6, 1884, when it is claimed they were returned to Foster in part payment of this property. The notes are produced, and I think there is no doubt that they are genuine. There appears to have been a sufficient reason for their making. The old notes were partnership ones that James H. Foster had promised his brother to take up, which he did by giving his own in their place.

The contention of the plaintiff is that, admitting their genuineness, they were paid some time, but he cannot say when, before the transfer of the property, when they were fraudulently revived for the purpose of being made a part of the consideration of such transfer.

Both Foster and Crawford swear positively that the notes were due and unpaid, according to their face, at the time of the transfer, and that they constituted a part of the consideration therefor; and there is no direct evidence to the contrary. But there are some circumstances in the case which contradict them with more or less force.

It is very unusual that notes of this amount—$16,930—are allowed by business men to go unpaid and unsecured for a period of 12 years, and that without the payment of interest for the last two-thirds of that time. Still, the matter is not so improbable as to prevent belief, when supported by the direct evidence of the parties.

On September 24, 1881, Crawford stated under oath, in writing, to the assessor of Linn county, that the notes then owned by him, and liable to taxation in the state, only amounted to $5,500. On June 7, 1883, he made an affidavit to procure a decrease of his assessment for 1882, in which he stated that the gross amount of his "money, notes, and accounts" subject to taxation was only $13,500.

Crawford's explanation of the apparent omission in both these statements of these three Foster notes is, there was an agreement between himself and Foster that on account of the interest on these notes being 10 per centum, instead of 12, the maximum allowed by law, the latter would pay the taxes thereon; that is, he would not deduct the amount from the value of his property assessed for taxation.

The explanation is open to the criticism that it is easily made and hard to contradict. But counsel says, if it is not true, the record of the assessments for the county will show it, at least negatively; and, as the plaintiff has not produced this evidence, as it was in his power to do, the presumption is that it would so far corroborate the testimony of the

defendants. At first blush this seems plausible; but if the fact is, as the plaintiff claims, these notes were paid, the record of the assessments would equally show that Foster did not deduct this indebtedness from his assessment; not for the reason given, but because it did not exist, at least from the time of such payment.

It may be admitted that a debtor and creditor may honestly make an agreement by which the former agrees not to deduct his indebtedness to the latter from the value of his property assessed for taxation, in consideration of which the creditor may honestly conclude that such indebtedness need not be returned by him for taxation as a credit liable thereto. Most persons are disposed to construe the law so as to keep out of the assessor's books as much as possible. But the law is otherwise, except in the case of a note secured by mortgage, since 1882; and the creditor, when called on to swear to the amount of credits belonging to him and subject to taxation in his hands, cannot lawfully or truthfully omit such credit from his return. But Crawford may have believed that the Foster notes held by him under the agreement stated were not liable to taxation *eo nomine*, because a tax on the value of the same was being paid by the debtor, as a condition of the credit. And therefore, while the failure of Crawford to return these notes for taxation is some evidence that they did not then exist as a legal obligation against Foster,—a living credit subject to taxation,—it is neither conclusive nor cogent on that point.

The defendant Goltra also testifies that in June, 1883, in talking with Crawford about Foster's financial condition, he said: "People think that Foster owes you considerable, or you have an interest in the mill;" when Crawford said: "He neither owes me, nor have I any interest in the mill." It is admitted he had no interest in the mill, and Crawford denies that he said Foster owed him nothing; and, all things considered, the denial at least neutralizes the assertion.

On this point my conclusion is that the weight of the evidence is that the three Foster notes in question were existing obligations between the parties at the date of the transfer; and that, whether this be so or not, the purchase was made in good faith, and for a valuable, and even adequate, consideration.

As to the purchase of the brick block by William Crawford, it is practically admitted that on July 20, 1867, William Crawford sold the mill in question to James H. and John Foster for $16,000,—$6,000 paid in cash, and $10,000 by the five joint notes of the purchasers for $2,000 each, payable in one, two, three, four, and five years, respectively, with interest at 10 per centum per annum, secured by a mortgage on the premises. The notes are in evidence, and each of them bears indorsements of payments of interest thereon, as follows: July 20, 1869, $400; July 20, 1875, $1,200; and April 15, 1881, $478.75.

All the business of William Crawford with Foster appears to have been transacted by John A. Crawford as his agent.

Crawford and Foster testify that about July 20, 1883, these five notes were unpaid, except as shown by the indorsements thereon, when they were by consent of parties exchanged for six notes signed by James H.

Foster as J. H. Foster & Co.,—five of them being for $2,000 each, payable in one, two, three, four, and five years from date, with interest at 8 per centum per annum, and the sixth one for $6,000; the amount of the overdue interest on the first five notes, payable in one year from date, without interest. These notes are also in evidence, and it appears from the testimony of Crawford that the exchange was made later than July 20th, and the notes were antedated, so as to make the old ones expire with the even year. They also testify that at the date of the transfer the second series of notes were due and altogether unpaid, and were given up to Foster in consideration of the conveyance to William Crawford of the brick block in question. William Crawford also testifies to the same effect, so far as he knows. He says the first series of notes was unpaid when his brother John got them from him for the purpose of making the exchange, and that the second series was unpaid when, at his brother's suggestion, he gave them to him for the purpose of purchasing the property then conveyed to him by Foster.

This is an improbable statement in all its essential features, though it may be true. Men do not usually allow debts of this character to run on for years without payment of the principal and comparatively little interest. The principal reason for changing the notes, that the legal rate of interest had in the mean time (October 25, 1880) been reduced to 8 per centum, is not satisfactory or convincing. Notwithstanding the change in the law, parties might still contract for 10 per centum, and contracts made before the change were not affected by it. Hill's Code 1887, §§ 3587, 3592. The exchange was not made until nearly three years after the change in the law, which did not affect the notes in any way, and could not reasonably have been the cause of the exchange. But if the creditor thought 8 per centum was as much as the debtor ought to pay under the circumstances, there was nothing to prevent reducing it either by new notes or a memorandum on the old ones, without any reference to the change in the law, or what the law might allow him to take.

On September 17, 1881, William Crawford made oath before the assessor of Linn county, in writing, that the notes owned by him and liable to taxation in the state amounted in value to only $5,000. John A. Crawford makes the same explanation of this matter that he did concerning the omission to return his own Foster notes for taxation,—that Foster was not to deduct the value of them from his assessment. But Foster says he did not make the deduction because Crawford did not charge him interest on the interest in arrear.

After the mortgage tax law of 1882 went into effect, in July, 1883, Mr. C. H. Stewart, the county clerk of Linn county, in looking over the record of mortgages for the purpose of making an abstract thereof for the assessor, found a mortgage of many years' standing from Foster to William Crawford on the mill property in question, given to secure the payment of a sum which then amounted, principal and interest, to about $25,000. He naturally supposed from the circumstances that it had been satisfied, and at once wrote to Mr. William Crawford to call and make the proper credits or cancellation, or it would be returned to the

assessor as in force. Mr. Crawford called immediately, on July 31st, and said the mortgage had been paid several years before, and that he had no knowledge of it being on the books of record, and then and there canceled it.

Mr. Stewart also testified that, a few days before the conveyances in question were filed with him for record, John A. Crawford was in his office, and spoke of the transfer of Foster's property, and said he was compelled to take it to protect himself; that he had indorsed largely for Foster, and thought the notes were paid, but they had lately "turned up" in Portland; and that the purchase notes for the mill had been sold and indorsed away by him long before, and he thought they were paid, but now they had "turned up" also, in Portland, unpaid.

I attach much importance to the testimony of this witness. His official position implies public confidence in his integrity. He speaks cautiously, and a rigid cross-examination only served to confirm and strengthen his opening statement. He cannot well be mistaken about the interview with William Crawford, nor the cause nor consequence of it. They affected his official duties, and the record of the cancellation corresponds with his statement. The conversation with John A. Crawford was on a subject that was then attracting the attention of that public, and was calculated to make an impression on him. Moreover, the witness, unlike some of those who testify to other alleged conversations in this case, has no grievance against Foster or the Crawfords, but is disinterested, and apparently unprejudiced.

True, it now appears that these mill notes were not indorsed to any one; and if they had been, Crawford would have had no right to cancel the mortgage. But this false statement as to the cause and consideration of the transfer of this block is at least a badge of fraud. Bump, Fraud. Conv. 42. William Crawford's action in canceling the mortgage, with the declaration that it had been paid several years before, tells a different story.

John Conner, a banker of Albany, testifies that between 1878 and 1880—he thinks in 1879—Foster was owing him $20,000 of borrowed money, when his cashier informed him that this Foster mortgage was on record uncanceled, whereupon he spoke to Foster on the subject, who replied "it had been paid and settled."

It may be admitted that this declaration of Foster's is not competent evidence in chief against William Crawford, to prove the payment of these notes. But Foster is introduced as a witness by Crawford to prove that the notes were not paid at the time of the transfer, and the plaintiff has a right to impeach him by evidence of contradictory statements made out of court. Mr. Conner is a disinterested witness, and no one questions that Foster made this statement to him. The effect of his testimony is to make Foster's now statement that the notes were unpaid of no effect. This leaves the fact of their non-payment at the time of the transfer to rest on the testimony of the Crawfords, which is also materially affected by their declarations and acts to the contrary out of court.

In addition to the evidence of these disinterested witnesses, the unpaid

creditors and others interested against the Crawfords, testify to various conversations with John A., which strongly imply, when they do not assent, that the mill notes were paid before the transfer.

Thomas I. Anderson testifies that 13 or 14 months before the transfer he asked John A. Crawford if he had anything to do with the mill, when he answered: "Oh, that is all settled. I have nothing more to do with the mill than you have."

It is true that John A. had then nothing to do with the mill in his own right, nor, so far as appears, ever had. But he always speaks in the first person when speaking for his brother William or of his affairs. And what he meant to say was "all settled," concerning this mill, unless it was William's mortgage thereon, is past finding out.

Thomas Monteith testifies that in the latter part of 1883 he had a conversation with John A., in which the latter said that Foster seemed to be getting along well. When he said, "Why don't he pay off the mortgage that has been on record, then, ever since he bought the mill?" John A. replied, "Why, that mortgage was paid off long ago."

There never was but one mortgage between Foster and the Crawfords, and that was the one to William on the mill, and unless these witnesses are false or mistaken, John A. said to them in effect if not in words, "these mill notes are paid off."

In answer to the testimony of all these witnesses concerning these statements of his, John A. Crawford, when called as a witness for himself, can only say, "I do not remember."

Another circumstance of which there is no doubt is entitled to some weight in this connection.

Between the giving of the mill notes in 1867 and the transfer in 1884, Foster expended $40,000 on the mill property in repairs and improvements. He also built the brick block in question, which cost him probably not less than $12,000, his dwelling-house and his share of the waterworks. To my mind it is quite improbable that a person with this amount of money at his disposal would allow a mortgage, to secure a debt of $10,000, to remain on his mill for 17 years. And it is equally improbable that William Crawford, or his other self, John A. Crawford, would allow the unpaid interest on such debt to accumulate to $6,000, and then take a note for the amount without interest or security. Being unable to deny the cancellation of the mortgage, as stated by Stewart, the Crawfords offer in their testimony this explanation: It was done to avoid the operation of the mortgage tax law of 1882. In other words, they swear that, rather than pay the taxes on the mortgage, they released security for the debt; and this, notwithstanding the law of 1854 gave the mortgagee the right to pay the taxes on the whole interest in the land, and add the same to the mortgage, if not paid by Foster. *Dundee, etc., Co.* v. *School-Dist.*, 10 Sawy. 61, 19 Fed. Rep. 359, and 21 Fed. Rep. 151.

On the whole, my conclusion is that the mill notes were paid before the conveyance to William Crawford was made, and therefore it is voluntary,—without consideration. And, this being so, it is fraudulent as against the plaintiffs and others, the creditors of Foster, the grantor

therein. The decided weight of the evidence supports this conclusion.

And yet it may be that these notes were existing obligations between the parties thereto on February 6, 1884, and that all the acts and declarations of the Crawfords to the contrary are falsehoods and pretenses, spoken and acted for the selfish purpose of avoiding the payment of the taxes thereon; but, if so, they have been ensnared in their own net, and cannot complain that the court has taken them at their own word.

Some question is made by counsel for the Crawfords as to the right of the plaintiff to maintain this suit. The testimony is satisfactory—indeed there is no room for doubt about it—that Sibson, Quackenbush & Co. and Noon & Co. sold and assigned their respective judgments to the plaintiff absolutely and for a valuable consideration,—$5,000 in the first case, and $500 in the second,—through the agent of the plaintiff's attorney in fact, William S. Ladd. And if Ladd & Tilton advanced him the money wherewith to make the purchase, as suggested in the argument, of which there is no proof, it would make no difference. The only question to be considered is, did the judgment creditors sell and assign the judgments in question absolutely, without any trust or reservation in their own favor? In other words, was the sale a real, and not a fictitious, one? As I have said, the evidence is satisfactory on this point. The sale was absolute and unqualified. This being so, it is altogether immaterial that the judgment creditors may have been induced to make this sale as they did, because they feared they could not succeed in enforcing the judgments in the state court,—the tribunal of the defendants, —or that the plaintiff made the purchase because, being a citizen of Illinois, he thought he could enforce the same against the property of the judgment debtor in the hands of the Crawfords, by a suit in this court, —the interstate tribunal,—and that he intended to do so when he bought them.

The motive with which a party purchases property or a claim has nothing to do with his right to maintain an action thereon or thereabout in this court, any more than in a state court. *McDonald* v. *Smalley*, 1 Pet. 623; *Barney* v. *Baltimore City*, 6 Wall. 288; *Collinson* v. *Jackson*, 8 Sawy. 363, 14 Fed. Rep. 305. The conveyances to John A. Crawford and Ashby Pearce being valid as against the plaintiff, the bill will be dismissed as to them, with costs.

The conveyance to William Crawford, being void as against creditors, will be declared fraudulent, and set aside, and the property sold by the master, and the proceeds applied, first, on the judgments of the plaintiff and his costs and disbursements in this suit, and the remainder, if any, *pro rata* on the judgments and costs and disbursements in this suit of Walden, Baltimore, and Liles. The decree will also provide that, if the proceeds of the sale are not sufficient to pay the judgments of the plaintiff and his costs and disbursements, execution may issue against the property of William Crawford for the remainder.

The judgments of the plaintiff are prior in time to those of Baltimore and Liles, but subsequent to that of Walden. Neither of the judgments, however, are liens on the property in question, the title of the judgment

debtor thereto having passed to William Crawford before the judgments were given or docketed. There was no interest of Foster's left in the property for the judgments to operate on. The conveyance was valid between the parties thereto. The right of the creditors to have it set aside for fraud as to them was all that was left. The plaintiff being the first creditor to assert this right, by the filing of his bill, then acquired a prior right to whatever may be made out of the property of the suit. *Burt* v. *Keyes*, 1 Flip. 72; Wait, Fraud. Conv. § 392; *In re Estes*, 6 Sawy. 459, 3 Fed. Rep. 134, and cases there cited.

In the latter case, after a careful examination of the subject, I held that under the law of this state the lien of a judgment only attached to property belonging to the judgment debtor at the date of its docketing, and that a conveyance, though void as to creditors who might assert their right against it, was valid between the parties, and passed all the estate of the grantor in the premises to the grantee; and therefore the lien of a subsequent judgment does not attach to the property.